Our second case for this morning is Thornton v. M7 Aerospace. Mr. Wisner. Good morning, Your Honors, and may it please the Court. I'm Floyd Wisner for the Plaintiff Appellants. Your Honors, there are about 700 Fairchild aircraft flying today. Fairchild itself has been out of business for about 14 years. My point is, who is there now to advise those 700 owners and operators of Fairchild aircraft of a known defect in the design of that aircraft? And, when a Fairchild aircraft crashes, killing all aboard, who is there to provide reasonable compensation to the families of those victims? But why isn't the question whether, I mean, everybody seems to agree this is governed by Illinois law, among the various candidates it might be governed by, assuming Illinois law, what is there to say that that's the right question to ask under Illinois law when, as far as we know, M7 didn't service the precise aircraft that crashed in Australia, and all the rest of the duties that Illinois law recognizes seem to flow from that kind of specific relationship, not just some general, you know, follow it all over the world. Right, Judge. And I'm concerned, and I try to be careful about what I'm asking the Court to do and what I'm not asking the Court to do. I'm not asking the Court to adopt a product line liability. I'm not asking the Court to change Illinois law. But I don't see how you're not, in fact, making a product line argument, because you repeatedly talk about the class of SA-227 aircraft. You just now started out that way. And as far as I can tell, any of these 700-some aircraft around the world that had a problem, that crashed or had some other problem, would be M7's responsibility, according to you. Well, I think so. That sounds like product. How's that not product line? Well, please allow me to make a distinction. As I said, you're adopting strict product liability. It's not negligence. It's strict product liability. If you continue the product line, if you buy a corporation that once sold Fairchild aircraft, and now you're the buyer of that corporation, you're strictly liable. That's product liability, as I understand it, Judge Wood. What I'm asking for is negligence liability, and only under very certain limited circumstances. And Judge, you're right that I'm asking this Court to go a step further and look at not just the service in the particular aircraft, but the particular model aircraft. I am asking that. But I think that's available under Illinois law. If you look at the Caleda decision, it says the belt loader line. It doesn't say the particular belt loader. It says belt loader line in that decision. In Gonzalez, it says customers, not customer. The Caleda case, though, involves a particular machine. It involves the kind of relationship that we're talking about. And I don't see anything in Illinois law that has taken the step you're advocating. Now, I realize you're here in federal court because there was a foreign sovereign removal. So maybe you would have rather stayed in state court. I get that. But here you are. And so we as a federal court can't really go where Illinois has not gone. I understand. I'm just asking this court to be a little more flexible than the underlying court about Illinois law. And I think Well, that's very problematic for us to be a little more flexible. I mean, this is all based on Illinois law. It is. Tell us how this is possible. Give me a chance, Judge, please. When I say flexible, maybe I use the wrong word. There's four factors under Illinois law. Two of them can't apply here. So shouldn't you put a non-applicable check next to that, Judge, instead of a no? I don't see why. You know, you're talking about Gonzalez, you know, succession to a predecessor, service contracts, and coverage of this particular machine. It just means this particular case may not be one where liability is going to happen. There could be other cases where there's a service contract. There's service contracts probably for a great number of the aircraft that are sitting out of O'Hare right now. Well, that's just my point, Judge. And this is the aviation industry, and it's completely different from a belt loader machine. In the aviation industry, there aren't any service contracts. There aren't any contracts to be assumed. There aren't any contracts for aircraft to be covered under. There's no aviation contract. So what you have is, we're going to carve out a distinction between I don't know what you mean when you say there are no service contracts. Like, you don't have a serviceman come out to O'Hare and go to Boeing and say, here's my line of, I've got my little satchel of equipment. I'll work on your airplane. United, American, they all have their own service departments. They don't have service contracts. Well, that's because, you know, obviously, as you know from the theory of the firm, sometimes it's better to have these things in-house and sometimes you contract out. I don't know that it makes any difference whether it's in-house or contracted out. Well, my point is it makes a huge difference because you're going to make a difference between smaller product manufacturers and big manufacturers of durable, potentially dangerous equipment like aircraft that continue to fly for years after a company's out of business. What you're going to do, if we stick with the district court's opinion, is that some companies like belt motor manufacturers, they're going to be liable on a successor basis while aircraft manufacturers will not be. And that just seems unfair to me. I can't believe that's true. But there's a particular kind of notice that a company has when there's a service contract. You know that there's a relationship and, you know, we haven't even gotten into the fact that when M7 takes over these Fairchild things, the contracts don't seem to leave it with this kind of liability. Well, that's true and I'm not arguing that they do. I'm not arguing that they expressly or impliedly assume liability. I'm just saying that they're, by operational law, there's a duty to warrant. And I'm really making a very narrow argument here, I believe, but it's something that's necessary. Should they afford the Mexican Aerovia? Yes, yes. And then when Aerovia sells to somebody else, they've somehow got to keep tracking where this thing ends up all over the planet? Well, you know, it's as bad an onerous burden as the court's question may imply. And that is because they've got a customer list. Those names are right on there. They sure use it enough to call and tell them about the services they can provide. They're making money out of continuing to provide services and support. Why not put a little responsibility on them, too? They're not making those kinds of dollars. You know how much money they make from these little service alerts and newsletters? No, but they make a lot of money by selling parts and providing maintenance and service on those airplanes. But they're not maintaining and servicing this thing in Australia. Not this particular aircraft, but certainly that model. And we can speak back to, again, the model aircraft. They are the original equipment manufacturer. That gives them the right to sell Fairchild proprietary parts. Most of the parts of an airplane are Fairchild proprietary parts. You can only get them from M7. They are the... What do you mean? You can get them only from M7? Yeah, Judge. Anyone who wants to sell airplane replacement parts can if they get certified by the FAA. So are you saying no one else has gotten certified to sell replacement parts? Certain replacement parts. And that's those proprietary parts, as that term is used in the aviation industry. I thought this enhanced ground proximity warning system was actually something that third-party vendors were selling. True. So we rather know that M7 is not the only source of replacement parts, since you wanted M7 to say buy part X from someone else. But that's only part of my case, Judge. The enhanced ground is only part of my case. There's no autopilot. There's a configuration in the cockpit. There's problems with the global positioning system, the radio altimeter, the co-pilot's altimeter. The EGPWS is only part of the case, but you're right about that. But my point is that we've got a unique situation with M7. And I get back to my opening remarks. It seems to me the old legal maximum, for every wrong there's a remedy. What do we do here? And in the Clark equipment case, this court and Judge Posner wrote pretty persuasively, I thought, about the need to plug the gap in products liability. The court said that there's a serious break in responsibility where you have one company go out of business. All the court is talking about in that case is that one can understand the reason why the law evolved in certain directions. But sometimes there are wrongs for which particular remedies do not exist. I mean, that happens all over the place in the law, maxims to the contrary notwithstanding. But don't we all agree that that's not the ideal world? That's not the way we want it. No, but you have to price it out. I mean, what would it do if somebody was responsible for all aspects of an airplane crash anywhere in the world, three sails down the road? I mean, these are significant economic decisions and there are reasons that the law draws the line at responsibility. Well, I would agree, but I'd also say there's no price you can put on a human life too. If it costs the money in order to protect against the loss of human life. That means everybody's an insurer who does so much as sell a nut or a bolt to an aircraft and that's, maybe that should be the rule, but it's certainly not the rule in Illinois. Well, I'm trying to stay away from that because that'll never be a winner and I agree to that, but I think that there is a way here and that is that let's apply the four factors. I keep getting back to when you have no service contracts to be assumed. Fairchild never had any service contracts, so M7 couldn't have sued them for anybody, any aircraft. M7 itself doesn't have service contracts, so this aircraft could not have been covered. To me, I think you have to put a non-applicable next to that check mark, not a no. How can that hurt us when you can't do something? Because there's a reason for those factors. Difficult as unweighted four-factor tests are, the reason for them does have to do with whether a company can plan its business model to recognize that there's a certain potential liability out there and so rather than it be a non-applicable, if it doesn't have to exist in this industry, it would seem to be a non-liability arrow. Well, I certainly can see you can look at it that way, but I also say that M7 didn't sit down to read Gonzalez before it decided to take over his business and didn't look at those four factors and also Judge, aren't factors usually... And you know, you feel so strongly about this, so you should be out there saying that people who want to buy airplanes need to get some kind of guarantee from the seller that will cover the life of the plane, which is totally unrealistic. I mean, I would be shocked if anybody would sign such an agreement, but you could have contract language that would give coverage, notwithstanding what the Illinois law is. You could. But you're just barking up the wrong tree on this one. Well, my job is to keep barking as long as I can, Judge. I mean, you know, I have a... Well, it's just a different audience you need to bark to. Not us. Go to the Illinois State Legislature. Well, or the Illinois Supreme Court. Or the Supreme Court. I understand that, and I understand limitations here. As Judge Wood mentioned, I tried hard to stay in state court. No disrespect intended, but... We'd be happy for you to be in state court in this case. I know that, Judge. Having said that, I think I better sit down. If you would like to save some rebuttal time, that would be wise. I will, Judge. Thank you. Mr. Pope. May it please the Court. I am Michael Pope, and along with Ms. Mamula, we represent M7, the appellee here. I think the most important fact in this case is undisputed, and that is TransAire was fully aware of its obligation to install an enhanced GPS system, and intended to do so within 30 days of this crash. Now, the Australian authorities had already mandated this as well, as I understand it? That's correct, Your Honor. FAA had issued a ruling in Australia, and I presume many other countries did as well. But Australia was one of them. Yes, right. And in the report, document 108, they say that they had intended to and started a retrofit system. So the thing we're supposed to be warning about had already been taking place. The other thing that's important about those warnings, I think from the FAA and from the various other authorities, they didn't ground these planes. They didn't say, oh, this is such an important safety issue. You have 90 days to do this. They gave them five years. Now, is this case about, Mr. Wisner just said that although enhanced ground proximity warning system is part of the case, it's not all of the case. Is that, I mean, reading the district court's opinion, it looked to me as though it had maybe boiled down to the enhanced system. I have a great deal of respect for Mr. Wisner. The last time, after the complaint was filed, the last time I heard about that was when he filed his reply brief in this court. The district court, we litigated, we discovered, we spent all the time focusing on the enhanced proximity system, and that's what this case was always about, as far as I can tell. And that's what the district court found. So what are your thoughts on the gap in products liability law here if M7 has no duty? Well, Your Honor, there's a couple of problems. First of all, remember, we bought assets out of a bankruptcy that gave us a release from prior liability. So we are not a manufacturer. We have never manufactured an airplane. We also have never manufactured an enhanced proximity device or any other kind of device. That's all outsourced to somebody else. So a lot of the questions that they're talking about make no sense. For example, Mr. Wisner's complaint really is we should stand in the shoes of Fairchild and have the same responsibility as if they were still in business. But if you read the Jablonski case, decided by the Illinois Supreme Court just three years ago, what do they say? A manufacturer is under no duty to issue post-sale warnings or to retrofit its products to remedy defects first discovered after the product has left its control. Clearly, if Fairchild was here, they wouldn't have a duty to do any warning, and I certainly think M7 is the same situation. I don't believe there's a gap. They have claims against the Australian airline and the Australian people that were supposed to do the training for the pilots. I understand there have even been some collections already made. So it's not like there's a gap in that sense. But any time a company goes bankrupt, there's a gap, if you call it that. But you can't do anything about that. And as Judge Wood said, the law in Illinois is pretty clear. And I would call your attention to go back and look at that Coletta case again, because the Coletta case very clearly says, no, this product line theory, which I think comes from the restatement, is not accepted by Illinois. So it's been specifically rejected, Your Honor, and I think you're bound by that. There's nothing much more you can say. When we talk about the Gonzales standards, remember, they fail all four of them. The successor to predecessor's service contracts, no. Coverage of the particular machine under service contract, no. Service of that machine by the purchasing company, no. A purchaser's knowledge of defects and the location or owner of that machine, no. So as this Court said, and Travis- So just to pause on that last point, you have to be making the argument that even though, as I understand it, the Australian group were subscribing to these newsletters and manuals and stuff, that's not enough to create knowledge of the location and owner of the machine? Absolutely, Your Honor. The fact that I have a subscription to the Wall Street Journal doesn't mean I buy and sell stocks every day. This is a subscription service. Anybody can be on there, and there's no requirement. This isn't a regulatory thing. This is a marketing thing. We just keep track of who wants something from us. We keep their name. We have no idea what else they have. They may have had a product that they sold. They may be about to buy another used plane. We have no way of knowing what they are. Or they could be simply, there's some companies that just do servicing on these kind of planes. They could be buying servicing manuals and extra parts for that purpose. So you think there is a servicing sector, in fact, for aircraft? Oh yeah, sure, kind of a midline company. General aviation more? This is a fairly small plane, right? It's a commuter plane, yes. It's about 20 or 30 passengers. So there's all kinds of services around the world that would provide service to those. Is it a jet or propeller? I think this was a jet. I could be wrong. Mr. Floyd knows. Okay, it's a propeller. But basically, there's no who, there's no who to by the entire aviation industry long before M7 even came into business. So if it hadn't been, would there have been some duty on the part of someone to warn the owners of these planes about a defective system? Just assume for the moment that this was a defective system. I realize you're arguing that it wasn't, but let's just say it was. The FAA, the Australian authorities, that's their job. Our job isn't to do that. Their job is to focus on those things. And they did. And they did. And as the record is really clear, Transair already knew and was in place of replacing this thing. So I don't think there's any need for me to go into the additional Gonzalez-Colito factors unless the court has questions for me, and I'd be happy to yield my time. Apparently not, sir. Thank you very much. Anything further, Mr. Weisner? Just a few points, Your Honor. First of all, the case is not limited to the enhanced ground proximity warning system. We can look right at the complaint, which is part of the record. I have a number of other allegations in there, lack of an autopilot, configuration of the cockpit, the instrument panel, the failures with regard to the co-pilots, altimeter, the radio altimeter, and the global positioning system. All in there, all part of this, not just limited to the enhanced ground proximity warning system. Those were all in your complaint. What I am looking at, the district court's opinion says one of your central claims is about the enhanced system. That's probably accurate, but it's not the only thing. But I don't see the district court talking about anything else. Right. I think the district court overlooked all that, and I think that was probably error, because the case is not just limited to that. And also, again, getting back to one of your other questions earlier, Judge Wood, is that I'm contending that this warning should have been given not just to Transair, but to the very first person they knew of, which is where the Mexican airline operator that had this aircraft at the time that M7 first became involved in this business. That's the one they should have notified. And there's no indication that that Mexican airline somehow was stopped from putting it on the plane, or there was some government regulation applicable to it. That's the one. Your Honor, also, this isn't a matter of just getting a subscription service. Transair, the owner at the time of the crash, was on M7's customer list. They knew their identity. It's not like going on a subscription to Wall Street Journal. They were our customer. It's on their services. They bought parts from M7. Also, Your Honor, this isn't just a general aircraft. This is a commuter aircraft. They're in there for business. They're carrying people for hire. They're charging them airfare. Jablonski. Mr. Pope mentioned about the ruling Jablonski. My point is that these defects were known at the time this aircraft was sold and at the time M7 came into business. We're not talking about defects known or knowledge of defects after that point. That's what Jablonski talks about. If Fairchild had been in business, they would have known. One final point, Your Honor, is that I've been talking about this voluntary duty by operational law. There's also a voluntary duty you can undertake just by assuming a duty, a voluntary assumption of a duty. That's in my brief, too. It is in your brief, but I thought that was a wildly expansive theory, actually. Just me, I guess. Your Honor, I think it's not as expansive as you might think in that the problem that the court had with it, she said there was not sufficient evidence to show reliance. And Caballero says you have to be no evidence, not sufficient. Caballero seems to say that. Oh, she just said sufficient. Look, the judge, when she says sufficient, she means in order to raise enough of an issue to get to a jury. She wasn't making some final assessment of which evidence was more powerful. Well, I think that the standard is no evidence versus insufficient evidence, and I think she found insufficient evidence, and that was my point. But also, I think there's sufficient evidence of reliance. Who else would you go to but for M7? And that was my whole point to this panel is that M7 is not just some other company that comes into existence and now has some of their assets. They're the man. They issue service bulletins. When the FAA needs to make revisions to this I took a deposition of M7's manager of technical support. He said to me, we're the manufacturer. That's a quote. Who else to impose a duty upon? Thanks very much. Thank you very much. Thanks to both counsel. We'll take the case under advisement.